896 So.2d 363 (2005)
Lee Roy JOYNER, M.D., Plaintiff-Appellee
v.
Samuel F. LIPRIE, Defendant-Appellant.
No. 39,342-CA.
Court of Appeal of Louisiana, Second Circuit.
March 11, 2005.
*364 Keith M. Borne, Lafayette, for Appellant.
J. Michael Hart, Greenwald Law Firm by Joseph W. Greenwald, Sr., for Appellee.
Before BROWN, MOORE, and DREW, JJ.
BROWN, C.J.
The present dispute arose out of a 1993 transaction between plaintiff, Lee Roy Joyner, M.D., and defendant, Samuel Liprie. The parties were friends and business associates. Liprie, a nuclear pharmacist, was a founder and director of Omnitron International, Inc., a company that produced HDR afterloaders, a device used to deliver radiation treatment to cancer patients. In December 1992, the FDA temporarily halted Omnitron's sales of the afterloaders. To raise capital to cover past due payables, Omnitron offered "to existing shareholders convertible debentures in the amount of 1,000,000 shares convertible into common stock of Omnitron International, Inc. at $1.00 *365 per share anytime between January 1, 1994 and December 31, 1999." Thereafter, it became clear that this phrase meant that the debentures would cost $1 per share and no cost would be added when they were converted to stock.
Liprie told Joyner, a pulmonologist who was familiar with Omnitron, that the convertible debentures could only be purchased by directors and offered to buy them in his name for Joyner.[1] In June 1993, Joyner gave Liprie $50,000, and Liprie purchased 50,000 debentures at $1.00 per share. In 1994, these debentures were converted to shares of stock without any further cost. The debentures and shares were in Liprie's name, and starting in 1997, Liprie began to receive dividends. What exactly the parties agreed to is the sine qua non of this dispute.
The parties presented contradictory testimony. Their differing views were essentially crystallized in three memos sent to Joyner from Liprie: the dates of the memos are June 6, 1993, June 10, 1993, and June 22, 1993. Liprie contends that the parties' agreement is outlined by the documents of June 6, and June 10, 1993. Liprie further asserts that the document dated June 22, 1993, was a fabrication that he did not author or send.
The June 6 memo provided that Liprie would purchase warrants (or convertible debentures) in his name for Joyner at $2.00 a share up to 50,000 shares "to be later (as specified by Omnitron International) converted to stock at a rate of ($1) one dollar a share."
Joyner sent Liprie a check for $50,000. The June 10 memo states that on June 10 Liprie received a personal check in the amount of $50,000 from Joyner for the purchase of warrants in Liprie's name for Joyner at $2.00 a share "for a total of (25,000) shares to be later (as specified by Omnitron International) converted to stock at a rate of ($1) one dollar a share."
Joyner argues that the first two documents were drafts for discussion. After he received the June 10 memo, Joyner made handwritten corrections on both the June 6 and June 10 memos to show the price of the warrants to be $1.00. On the June 10 letter, Joyner also wrote, "I have sent you a check for $50,000 to match your $50,000 ... together to purchase 100,000 shares." These corrections were then faxed to Liprie by Joyner's business manager, Patsy DeLaSalle. Joyner testified that five days later, on June 15, he had a telephone conversation with Liprie which was heard on a speaker phone by Stanley Palowsky. In that conversation, Liprie agreed to make the changes.[2] The memo dated June 22 allegedly followed and according to Joyner contains the terms of the final agreement.
The June 22 memo provides that "(Liprie) will purchase warrants (or convertible debentures) in (Liprie's) name for (Joyner) at the rate of ($1) one dollar a share ... for a maximum of (50,000) fifty thousand shares to be later (as specified by Omnitron International) converted to stock at a rate of ($1) one dollar a share." Joyner states that this June 22 document shows that there was an agreement for him to purchase through Liprie 50,000 debentures at $1.00 per debenture and, although not mentioned in the memo, that Liprie was to purchase an additional 50,000 debentures using his own funds.
*366 In February 1996, Joyner filed suit against Liprie requesting a transfer of 50,000 shares of Omnitron stock held in Liprie's name. In December 2001, a supplemental and amending petition was filed to recover dividends paid and damages for a lost opportunity to purchase Neocardia stock.[3] Liprie answered, stating that he was distributing the debentures and stock at a marked up price because they were not otherwise available to Joyner. Liprie claims that only 25,000 debentures were purchased for Joyner which were converted to shares that Liprie would transfer to Joyner's name upon payment of a $1.00 per share fee. Liprie claims that Joyner was given the opportunity to obtain the shares by paying the fee before any dividends were paid or the Neocardia deal occurred. In short, Joyner claims he paid $50,000 for 50,000 shares while Liprie claims that Joyner should pay $75,000 for 25,000 shares.
The trial court determined that the document dated June 22, 1993, represented the intent of the parties. The trial court then found that a fiduciary relationship did exist between Liprie and Joyner, that Liprie was in violation of that fiduciary relationship, and that Joyner was entitled to the stocks and their fruits, including dividends paid and the missed opportunity to invest in NeoCardia that was offered to Omnitron shareholders. Judgment was rendered ordering the transfer of Liprie's 50,000 shares of Omnitron stock to Joyner and damages in the amount of $267,990.71 for dividends paid and $313,137.60 for the lost opportunity to obtain NeoCardia stock, with legal interest from the date the initial action was filed, were awarded. Liprie has appealed from the trial court's judgment.
After reviewing the record, we amend and, as amended, affirm.

Discussion

The Agreement
Liprie contends that this June 22 document was fabricated, and he denied authoring or sending this memo. Liprie's document examiner/handwriting expert, Mary Ann Sherry, testified that Liprie's signature on the June 22 memo was "identical" to his genuine signature on a letter mailed to Joyner on June 21 (both the memo and letter were simply signed "Sam"). She surmised that signatures are never exactly the same and thus, she concluded that the signature on the June 22 memo was lifted from the June 21 letter. She attached overlays to her report and this court can easily see that the signatures were "exactly" the same. We also note that "Sam" in the memos of June 6 and 10 had variations and did not "exactly" fit the overlay. The fax transmittal data on the June 22 memo identified Liprie as the sender. Liprie claims that this data was also lifted from the June 21 letter.
There was testimony from Stanley Palowsky and Patsy DeLaSalle. Palowsky testified that he was present with Joyner for a telephone conversation held on a speaker phone between Liprie and Joyner concerning the first two memos. Palowsky testified that in this conversation, it was agreed between Liprie and Joyner that they would each purchase 50,000 debentures. Palowsky further testified that Liprie desired to purchase 100,000 debentures at $1.00 each because he wanted to match the purchase of another stockholder. Liprie and Joyner agreed to "kick the paperwork around so the language was satisfactory to both parties."
*367 Ms. DeLaSalle, Joyner's business manager at the time the deal was being made, testified that she had seen documents being traded back and forth between Liprie and Joyner. She further stated that through phone conversations with Liprie, she learned that he was going to purchase 50,000 debentures for himself and 50,000 debentures for Joyner.
A letter dated June 9, 1993, from Liprie to Barbara Johnson at Omnitron states: "Please find the enclosed check (# 789) in the amount of Fifty Thousand Dollars. This is to be applied towards convertible debentures. I will be offering another check in the amount of Fifty Thousand Dollars in approximately 2½ weeks. This check will also apply towards convertible debentures. This will be the last of my money for after this I will be drained."[4]
The trial record is filled with conflicting evidence as to which documents are the truest representation of the parties' intent. One problem with the June 22 memo is that it was faxed and that no original exists. Also, the genuine standard, the June 21 letter, could not be found by Joyner, and the expert had to use a copy. Credibility was certainly at issue.
A perplexing problem is that when Joyner filed this action in 1996, he did not reference the June 22 memo, nor did he mention the June 22 memo in filings thereafter, and, in particular, in his motion for summary judgment. Only after this case was set for trial in 1998 did the June 22, 1993, memo emerge.
The trial court has great discretion in this situation and there is sufficient evidence to support the trial court's credibility determination, which was that the document dated June 22, 1993, was authentic and the truest representation of the agreement between the parties. Thus, even if we disagree, we cannot say that the court's ruling on this issue is manifestly erroneous.

Conversion
Liprie next argues that the trial court erred in ordering that the 50,000 shares of Omnitron stock be turned over to Joyner without requiring him to pay the $1.00 per share conversion rate stipulated in the agreement. According to Liprie, the agreement, even the document dated June 22, 1993, requires Joyner to pay Liprie $1.00 per share to have the debentures converted to stocks and put into Joyner's name.
The documents state "... fifty thousand shares to be later (as specified by Omnitron International) converted to stock at a rate of ($1) one dollar a share." When Omnitron converted the debentures to stocks, they required no payment to convert them. Liprie's sole argument is that the $1.00 per share payment is required by the agreement between himself and Joyner, and until this payment is made, he is the owner of the Omnitron stock.
Joyner argues that the language in the document is ambiguous. He states that he interpreted the document to mean that the conversion rate would be specified by Omnitron International at a later date. Joyner argues that an ambiguity in a document must be construed against the drafter, who in this case is Liprie. See Wallace v. First Assurance Life of America, 37,865 (La.App.2d Cir.12/10/03), 862 So.2d 374.
The trial court, without giving reason, ruled that the debentures were converted *368 to shares of stock without further payment, thus, no further payment should be required of the defendant.
The wording of the three documents in question differs as to the price to be paid for each convertible debenture, but all three documents contain the following language: "Upon receiving the dollar amount, I will purchase warrants (or convertible debentures) in my name for Dr. Lee Roy Joyner... [A]s soon as I am legally able to, I will convert the above purchased warrants (or convertible debentures) out of my name (along with any interest paid on the warrants) and into the name of Dr. Lee Roy Joyner."
Although the language in all the documents is clear that the conversion rate was $1.00 per share, it is also clear that Joyner was led to believe that this was the price Omnitron was charging. Liprie told Joyner that he needed help in purchasing enough shares to maintain his voting position in Omnitron. Liprie would receive this by Joyner buying 50,000 shares in Liprie's name. Instead, Liprie inflated the price to Joyner. This is fraud, and Liprie should not be allowed to profit by this misconduct. Thus, we find no error in the trial court's ruling.

Damages
Next, Liprie asserts that the trial court erred in awarding damages to Joyner for the lost business opportunity of acquiring stock in NeoCardia.
Shareholders of Omnitron were offered the opportunity to acquire a certain number of shares in NeoCardia proportional to the number of shares they owned in Omnitron. Liprie did not take advantage of this offer for any of his shares of stock. Joyner, who at this time owned 5,000 shares of Omnitron, however, did take the offer. Joyner contends that he would have purchased more had he had the opportunity, but the offer was only available to Omnitron shareholders in the amount of shares they owned in Omnitron.
The offer of NeoCardia stock made to Omnitron shareholders states in part:
In the event that on or before July 20, 1995 the company does not receive subscriptions and payment in full for all of the 3,000,000 Units offered hereby, Units not subscribed for will be available to be purchased, prior to July, 24, 1995, by any and all Offerees who initially elected to subscribe for Units (see page 7 of the Subscription Agreement), and any Units not so subscribed and paid for prior to July 24, 1995 shall be purchased by RIF on or before July 31, 1995.
Thus, Joyner, who initially elected to subscribed to Units based on his personal 5,000 shares of Omnitron, was eligible to purchase as many leftover shares as he wished between the dates of July 20, 1995, and July 24, 1995. According to Plaintiff's Exhibit-27, only 271,008 units were purchased during the initial offering. Thus, during the period between July 20, 1995, and July 24, 1995, there were 2,728,992 units available to Joyner. He did not purchase any of these available units.
A breach of fiduciary duty grounded in a missed opportunity cannot result in damages when the ability to take advantage of the opportunity was clearly present. Silliman Private School Corporation v. Shareholder Group, 01-0964 (La.App. 1st Cir.05/10/02), 819 So.2d 1088. Since the opportunity to purchase additional NeoCardia Units was readily available to Joyner, and he chose not to take advantage of the opportunity, it cannot be said that Liprie's breach of fiduciary duty resulted in the loss of an opportunity for Joyner. For this reason, we reduce the trial court's damage award to delete the amount attributable to the loss of opportunity *369 to purchase NeoCardia stock, which amount is $313,137.60.

Interest
Finally, Liprie argues that the trial court erred by awarding interest on damages accruing from the date of original judicial demand.
A supplemental pleading differs from an amended pleading in that an amended pleading involves matters which occurred before the original complaint was filed and which were either overlooked by the pleader or were unknown to him at that time, while a supplemental pleading covers issues or causes of action which have arisen since the filing of the original petition, which relate to the issues or actions contained in the original petition. Gaines v. Bruscato, 30,340 (La.App.2d Cir.04/08/98) 712 So.2d 552.
Here, the original pleadings sought to have the debentures/stock placed in Joyner's name. Prior to that time, no dividends had been paid out by Omnitron. Thus, these damages did not exist until the time that dividends were paid out, which was subsequent to the original pleadings.
A supplemental pleading sets forth items of damages, causes of action or defenses which have become eligible since the date of filing the original petition or answer, and which are related to or connected with the causes of action or defenses asserted therein. C.C.P. art. 1155. Thus, the pleadings for damages for dividends paid out is a supplemental pleading, and interest for those damages should not begin to accrue until the date that the supplemental pleading was filed. For this reason we delete the trial court's award of interest on damages accruing from the date of the original judicial demand, and instead order interest to accrue from the date of the filing of the supplemental petition.

Conclusion
For the reasons set forth above, we amend the trial court's judgment to delete the award of damages in the amount of $313,137.66 for loss of opportunity to purchase NeoCardia stock. In all other respects the judgment is affirmed, however, with interest to accrue from the date of the filing of the supplemental petition. Costs are to be borne equally by both parties.
NOTES
[1] At this time, Joyner owned no Omnitron stock, but for consulting work had been given an option which he later exercised to buy 5,000 shares.
[2] Joyner testified that this conversation was taped-recorded but that his children in play destroyed the tape.
[3] Neocardia is a limited liability company formed by Omnitron to use its technology in intravascular radiotherapy.
[4] Liprie spoke with Joyner and confirmed that he had sent the $50,000 check and Liprie then sent his check to Omnitron.